IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-00391

LEGACY PARTNERS, LLC;
KIRK ELLIOTT PhD PRIVATE ADVISORS, LLC;
ASHLEY KUNKLE, LLC;
THE MODERN CLASSIC, LLC; and
A&N INVESTMENTS, LLC,

        Plaintiffs,

v.

TERAH OTT;
FTM WEALTH, PLLC;
REA SOLUTIONS, LLC;
ROBERT E. ANDERSON;
RBRADY A SYSTEMS, LLC; and
RICHARD B. ANDERSON,

        Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs respectfully submit the following in support of their Complaint and Jury Demand, and allege as follows:

## PARTIES, VENUE, AND JURISDICTION

1.      Plaintiff Legacy Partners, LLC is a limited liability company. Its members are, or at all relevant times were, Kirk Elliott PhD Private Advisors, LLC; Ashley Kunkle, LLC; The Modern Classic, LLC; and A&N Investments, LLC (collectively Members).

2.      Kirk Elliot PhD Private Advisors, LLC (n/k/a Kirk Elliott Precious Metals LLC KEPM) is a limited liability company. Its sole member is Kirk Elliott, a citizen of Colorado.

126410776.7

3.     Ashley Kunkle, LLC is a limited liability company. Its sole member is Ashley Kunkle, a citizen of Colorado.

4.     Modern Classic, LLC is a limited liability company. Its members are Riley Canada and Josh Canada, both of whom are citizens of Colorado.

5.     A&N Investments, LLC is a limited liability company. Its members are Aaron Webb and Nicole Webb, both of whom are citizens of Alabama.

6.     Defendant Terah Ott is a citizen of Arizona. Ms. Ott is an attorney, licensed to practice law in the State of Texas. Her license is currently subject to an administrative suspension. Ms. Ott is the President of Defendant FTM Wealth, PLLC.

7.     Defendant FTM Wealth, PLLC is a professional limited liability partnership. Ms. Ott is the sole member of FTM Wealth. On information and belief, FTM Wealth is an alter-ego of Ms. Ott.

8.     Defendant REA Solutions, LLC is a limited liability company. Its sole member, Defendant Robert E. Anderson, on information and belief now deceased, was a citizen of Texas. On information and belief, REA Solutions was an alter ego of Robert E. Anderson while Mr. Anderson was alive

9.     Defendant RBrady A Systems, LLC (Rbrady) is a limited liability company. Rbrady provides non-CPA tax preparer services. On information and belief, Rbrady is an alter-ego of Richard Anderson.

10.     Venue is proper in the District of Colorado under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the district.

11.      This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332, because the amount in controversy exceeds $12 million and the dispute is between citizens of different states.

12.      This Court has personal jurisdiction over Defendants because Defendants directed their activities at Colorado.

13.      Ms. Ott made phone calls and emails to Plaintiffs in Colorado and visited Plaintiffs in Colorado multiple times to persuade Plaintiffs to enter into business with Defendants and to further Defendants' business relationship with Plaintiffs. Ms. Ott and FTM Wealth's contract with Plaintiffs required Ms. Ott and FTM Wealth to provide services to Colorado residents that included preparing documents intended to be used in filing Colorado state tax returns. Ms. Ott's contacts with Plaintiffs in Colorado were made in furtherance of Defendants' shared scheme.

14.      Robert Anderson sent emails and phone calls to Plaintiffs in Colorado and visited Plaintiffs in Colorado to persuade Plaintiffs to enter into business with Defendants and to further Defendants' business relationship with Plaintiffs. Robert Anderson provided services to Colorado residents under FTM Wealth and Ms. Ott's contract with Plaintiffs. Robert Anderson's contacts with Plaintiffs in Colorado were made in furtherance of Defendants' shared scheme.

15.      Richard Anderson prepared tax returns for Plaintiffs under FTM Wealth and Ms. Ott's contract with Plaintiffs. His contacts with Plaintiffs in Colorado were made in furtherance of Defendants' shared scheme.

16.      Plaintiffs were harmed by Defendants' activities in Colorado, and the harm Plaintiffs suffered due to Defendants' activities was felt in Colorado. Defendants contracted to

provide services to Colorado resident Plaintiffs, including the preparation of documents intended to be used in filing Colorado tax returns.

## FACTUAL ALLEGATIONS

17.     Dr. Kirk Elliott runs a business that involves helping clients acquire precious metals. The business has experienced rapid growth in recent years, and Plaintiffs sought advice and legal counsel concerning the corporate and tax structure of that business.

18.     In 2022, Plaintiffs learned Ms. Ott offered services that included providing legal advice on tax planning strategies to help her clients reduce their tax liability in a manner that was purportedly compliant with applicable tax laws.

19.     In 2022, Plaintiffs communicated with Ms. Ott regarding the services she purported to provide. Ms. Ott, and her law firm FTM Wealth, represented that they had a valuable strategy for reducing Plaintiffs' tax liability (the Strategy).

20.     The Strategy, as devised by Ms. Ott, and/or others working with her and under her supervision and control, and as applied in this case, was for the Members to form a new limited liability entity—Legacy Partners. Each of the Members would contribute, among other assets, intellectual property consisting of the expertise and know-how of its own members, to Legacy Partners. Ms. Ott and her associates would place a valuation on the intellectual property contributed by each Member (Contributed IP), and the Contributed IP would become an asset of Legacy Partners. Each year for an eleven-year period, Defendants would assist Plaintiffs in preparing and validating the Schedule K-1s issued by Legacy Partners to the Members allocating to them permissible deductions resulting from the contribution transaction.

4

21.     Ms. Ott and FTM Wealth were aided in selling the Strategy to Plaintiffs, and in executing the Strategy, by the remaining Defendants.

22.     Robert Anderson, held himself out as to Plaintiffs as a lawyer, and described his past experience representing high net worth individuals in pursuing the Strategy. He represented on his LinkedIn profile that he was a graduate of Thomas M. Cooley Law School. He helped persuade Plaintiffs regarding the legality of the Strategy and the extent to which the Strategy would permit Plaintiffs to lessen their tax liability.

23.     RBrady and Richard Anderson prepared tax returns for Plaintiffs based on the Strategy.

24.     Defendants agreed to persuade Plaintiffs to pursue the Strategy and charge Plaintiffs fees in connection with pursuing the Strategy.

25.     Defendants advised and represented that the Strategy was legal and would permit Plaintiffs to legally lessen their tax liability. The stated benefit to Members of forming Legacy Partners, making and documenting the contributions of intellectual property, and documenting the depreciation of the Contributed IP, was to enable Members to claim the losses for tax purposes. Ms. Ott and Robert Anderson represented the Strategy was the product of years of work and experience, and described their past experiences using the strategy to dramatically and legally reduce their clients' tax liability.

26.     Plaintiffs sought and received advice from FTM Wealth, Ms. Ott, REA Solutions, and Robert Anderson regarding the tax and legal consequences of the Strategy. When discussing the Strategy with Defendants, Plaintiffs were aware that Ms. Ott was an attorney, and

believed Robert Anderson was an attorney. Plaintiffs believed that an attorney-client relationship existed between themselves and FTM Wealth, Ms. Ott, REA Solutions, and Robert Anderson.

27. Legacy Partners was formed in 2022 to pursue the Strategy at the direction of Ms. Ott and Robert Anderson and consistent with Ms. Ott and Robert Anderson's advice.

28. In reliance on Defendants' legal advice and representations regarding the Strategy, Legacy Partners entered into an Engagement Letter with FTM Wealth on December 28, 2022.

29. Under the Engagement Letter, FTM Wealth agreed to, among other things:

   a. "[e]ngage Client in consultation(s) to assess, educate and document any know-how or trade secret intellectual property Client's members and partners may possess and wish to contribute as capital to Legacy Partners, LLC";

   b. "consult with attorney partners to draft and execute all documents necessary to formalize agreements between Members of Legacy Partners, LLC as pertains to a capital formation event to be organized in December 2022"; and

   c. "provide expert opinions, legal advice, and valuation documentation as required for explanation and validation of the K-ls issued by Legacy Partners to the four (4) partners named above that flow out of the above described 2022 capital formation event over the course of the next eleven (11) consecutive tax seasons."

30. The Engagement Letter required Legacy Partners to pay FTM Wealth a fee of $4 million per year for eleven years, totaling $44 million dollars. To date, Legacy Partners has paid FTM Wealth $12 million.

31. The Engagement Letter required Legacy Partners to hold "information regarding the methods and concepts used in tax filing/position in strictest confidence." The Engagement Letter ostensibly prohibited Legacy Partners from disclosing, for its own benefit, "any confidential information" without "prior written approval of FTM Wealth."

6

32.     Relying on Defendants' legal advice and representations, Members executed a Capital Formation and Valuation Agreement drafted by Defendants on December 28, 2022.

33.     Robert Anderson worked together with Ms. Ott to determine the "fair market value" of the Contributed IP.

34.     Defendants did not describe the method used in arriving at the valuation of the Contributed IP or provide Plaintiffs any documentation regarding the basis of the valuation prior to the execution of the Engagement Letter or the Capital Formation and Valuation Agreement. Defendants claim the method used to value the Contributed IP is a trade secret and refused to reveal that methodology. In August 2024, in connection with Plaintiffs' inquiries about the methodology, Ms. Ott offered to provide the methodology in exchange for an additional payment of $250,000.

35.     The Capital Formation and Valuation Agreement states the "fair market value" of each Member's Contributed IP. Members were assigned a percentage interest in Legacy Partners based on their Contributed IP and any other assets contributed through the Capital Formation and Valuation Agreement.

36.     On information and belief, Defendants had no legitimate basis for the valuation of the Contributed IP. Defendants knew the stated valuation of the Contributed IP lacked any factual or legal basis.

37.     Starting in 2022, Defendants, at the direction of Ms. Ott, retained RBrady to prepare the Form 1065 tax returns and Schedules K-1 for Plaintiffs. Richard Anderson, prepared the tax returns and K-1s. The K-1s include the "fair market value" of the Contributed IP in the tax basis capital accounts of each Member.

38.     Starting with the 2022 Tax Year, Members claimed deductions on their tax returns based on Defendants' assessment of the depreciation of the Contributed IP.

39.     On information and belief, Defendants had no legitimate basis for the stated depreciation of the Contributed IP. Defendants knew the tax returns prepared by RBrady misstated Plaintiffs' tax liability.

40.     Unbeknownst to Plaintiffs, the Strategy had no legal basis.

41.     Section 1012 of the Internal Revenue Code specifies the tax basis of an asset for tax purposes. The tax basis of an asset is the cost basis of the asset, *i.e.*, the amount the taxpayer paid for the asset, increased by capital expenditures incurred with respect to the asset that have not yet been depreciated or amortized. No provision of the Internal Revenue Code permits a taxpayer to assign a "fair market value" to property and take the position that immediately after contributing the property to a partnership[1] the partnership has a tax basis in the property equal to the fair market value of the property. Rather, Section 723 of the Internal Revenue Code provides that the tax basis of property contributed to a partnership by a partner is its adjusted basis at the time of contribution increased by the amount (if any) of gain the contributing partner recognizes under Section 721(b) of the Internal Revenue Code. Thus, when the partner's tax basis in the property is zero and the partner does not recognize gain in the contribution transaction, the partnership's initial tax basis in the property is zero. The central premise of the Strategy, that Members could "contribute" their exiting knowledge to a partnership and the partnership could claim an initial tax basis equal to the fair market value of the Contributed IP, thereby allowing

---

[1] Although Legacy Partners is a limited liability company, it is considered a partnership for tax purposes.

the partners to claim amortization deductions against that fair market value tax basis of the Contributed IP, was legally baseless.

42.    Because Defendants' statement of the tax basis of the Contributed IP was incorrect and legally and factually baseless, Members had no legal right to claim the amortization deductions reported on the Schedule K-1s prepared by Defendants. The tax returns iled in reliance on Defendants' legal advice and services under the Engagement Letter therefore materially overstated the deductions Members could claim. Members had to delay the filing of their 2023 state and federal tax returns beyond the filing due date once they became aware that the Schedule K-1s issued by Legacy Partners erroneously overstated the tax basis of the Contributed IP and allocated impermissible amortization deductions to the Members.

43.    After realizing the Strategy was baseless, Plaintiffs terminated the Engagement Letter on August 19, 2024.

44.    After terminating the Engagement Letter, Legacy Partners demanded Ms. Ott and FTM Wealth to immediately provide all information and documents related to Defendants' legal advice and services rendered under the Engagement Letter, including information and documents related to the method used to value the Contributed IP. Defendants refused on the grounds that the Strategy and the methods used to value the Contributed IP are, confidential, proprietary, and trade secrets.

45.    The Strategy and the methodology used to value the Contributed IP are not, and cannot be, confidential. The tax basis of an asset is a question of fact that must be disclosed to the IRS to support various tax reporting positions with respect to the asset, including the amount of amortization deductions that may be taken with respect to the asset. The Engagement Letter

9

expressly contemplated such disclosures and required Defendants to provide information, legal advice, expert opinions, and documentation as required to explain and validate the K-1s. Defendants' baseless insistence on confidentiality is part of a deliberate effort to conceal their wrongful acts and to prevent Plaintiffs from learning that the Strategy lacked a legal or factual basis.

46.     As a result of Defendants' conduct, Plaintiffs have suffered damages including costs of obtaining legal advice regarding the Strategy and costs incurred to correct tax returns filed in mistaken reliance on the Strategy. Defendants' conduct has also exposed Plaintiffs to penalties, interest, and other potential legal sanctions for filing incorrect and unsupportable tax returns.

47.     Defendants' conduct was purposeful and was intended to induce Plaintiffs to enter into the Engagement Letter and pay Defendants' exorbitant fees. Defendants acted recklessly, heedlessly, and without regard to the consequences Plaintiffs would face from pursuing the Strategy.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract – Against FTM Wealth**

48.     Plaintiffs incorporate by reference paragraphs 1–47 of this Complaint as if fully set forth herein.

49.     The Engagement Letter is a contract between Legacy Partners and FTM Wealth.

50.     All other Defendants served as agents of FTM Wealth in providing the services specified under the Engagement Letter.

51.     The Members and other Plaintiffs are third party-beneficiaries to the contract because Legacy Partners and FTM Wealth intended that Members and other Plaintiffs would

10

directly benefit from the contract by receiving K-1s allowing them to claim losses on their tax returns.

52.     The Engagement Letter required FTM Wealth, among other obligations, to provide "expert opinions, legal advice and valuation documentation as required for explanation and validation of the K-1s" issued to Members.

53.     FTM Wealth has breached its obligations under the Engagement Letter and cannot explain or validate the content of the K-1s.

54.     Legacy Partners performed under the Engagement Letter until August 19, 2024, at which time it terminated the Engagement Letter.

55.     FTM Wealth's breach of the Engagement Letter caused Plaintiffs to incur $12,000,000 in fees paid under the Engagement Letter for a strategy that had no practical value, caused Plaintiffs to incur costs related to correcting the misstatements Defendants caused Plaintiffs to make on state and federal tax returns, and exposed Plaintiffs to penalties and interest in connection with filing the flawed tax returns.

## SECOND CLAIM FOR RELIEF
**Professional Malpractice – Against FTM Wealth, Ms. Ott, REA Solutions, and Robert Anderson (the "Attorney Defendants")**

56.     Plaintiffs incorporate by reference paragraphs 1–47 of this Complaint as if fully set forth herein.

57.     The Attorney Defendants' services under the scope of work included providing legal services.

58.     An attorney-client relationship existed between Plaintiffs and the Attorney Defendants.

59.    As attorneys, the Attorney Defendants owed Plaintiffs a duty to use the

knowledge, skill and judgment ordinarily possessed by members of the legal profession in

carrying out their services for Plaintiffs.

60.    The Attorney Defendants' conduct, including recommending Plaintiffs pursue

the Strategy, was negligent and breached their duties to Plaintiffs.

61.    The Attorney Defendants' breaches of duty harmed Plaintiffs by causing them to

pay $12 million in fees under the Engagement Letter for legal services that had no value, and to

incur costs related to correcting the misstatements Defendants caused Plaintiffs to make on state

and federal tax returns, and by exposing Plaintiffs to penalties and interest in connection with

filing the flawed tax returns.

**THIRD CLAIM FOR RELIEF**
**Breach of Fiduciary Duty – Against Attorney Defendants**

62.    Plaintiffs incorporate by reference paragraphs 1–47 of this Complaint as if fully

set forth herein.

63.    The Attorney Defendants' services under the scope of work included providing

legal services.

64.    An attorney-client relationship existed between Plaintiffs and the Attorney

Defendants.

65.    As attorneys, the Attorney Defendants owed Plaintiffs a fiduciary duty of

undivided loyalty.

66.    The Attorney Defendants' conduct, including advising Plaintiffs to pursue the

Strategy and charging unreasonable fees, advanced the Attorney Defendants' interests to the

detriment of Plaintiffs.

67.     The Attorney Defendants violated their duty of undivided loyalty to Plaintiffs.

68.     The Attorney Defendants' breaches of duty caused Plaintiffs to pay $12 million in fees under the Engagement Letter for services that had no value, caused Plaintiffs to incur costs related to correcting the misstatements Defendants caused Plaintiffs to make on state and federal tax returns, and exposed Plaintiffs to penalties and interest in connection with filing the flawed tax returns.

## FOURTH CLAIM FOR RELIEF
### Fraudulent Inducement - Against Attorney Defendants

69.     Plaintiffs incorporate by reference paragraphs 1–47 of this Complaint as if fully set forth herein.

70.     The Attorney Defendants' statements that the Strategy was legal and would allow Plaintiffs to legitimately lessen their tax liability were false.

71.     The Attorney Defendants' statements regarding the valuation of the Contributed IP were false.

72.     Given the Attorney Defendants' knowledge of tax issues, the clear illegality of the Strategy to a person familiar with tax law, and the ease of accessing the Internal Revenue Code which prohibits the Strategy, Attorney Defendants either knew that the statements were false or acted with reckless disregard as to the truth of the statements.

73.     The Attorney Defendants, who held themselves out as possessing a secret strategy to lessen Plaintiffs' tax liability, had superior knowledge of the law not reasonably available to Plaintiffs.

74.     Plaintiffs did not know the Attorney Defendants' statements were false.

75.      Plaintiffs justifiably relied on the Attorney Defendants' statements when they decided to enter into the Engagement Letter and pursue the Strategy.

76.      Plaintiffs' reliance on the Attorney Defendants' statements regarding the Strategy caused Plaintiffs to pay $12 million in fees under the Engagement Letter for services that had no value, caused Plaintiffs to incur costs related to correcting the misstatements Defendants caused Plaintiffs to make on state and federal tax returns, and exposed Plaintiffs to penalties and interest in connection with filing the flawed tax returns.

**FIFTH CLAIM FOR RELIEF**
**Negligent Misrepresentation – Against All Defendants**

77.      Plaintiffs incorporate by reference paragraphs 1–47 of this Complaint as if fully set forth herein.

78.      Defendants' statements that the Strategy was legal and would allow Plaintiffs to legitimately lessen their tax liability were false.

79.      Defendants' statements regarding the valuation of the Contributed IP false.

80.      Defendants' statements were incorrect and made without reasonable care.

81.      Defendants' statements were made to guide Plaintiffs in their business transactions with knowledge that Plaintiffs would rely on the statements.

82.      Plaintiffs justifiably relied on Defendants' statements when they decided to enter into the Engagement Letter and pursue the Strategy.

83.      Plaintiffs' reliance on Defendants' statements caused Plaintiffs damages, including payments under the Engagement Letter, costs incurred to correct misstatements on tax returns, and exposure to penalties and interest from filing flawed tax returns.

14

## SIXTH CLAIM FOR RELIEF
### Civil Conspiracy - Against All Defendants

84.    Plaintiffs incorporate by reference paragraphs 1–47 of this Complaint as if fully set forth herein.

85.    Defendants agreed to convince Plaintiffs to enter into the Engagement Letter, to pursue the Strategy, and to make payments to Defendants in exchange for Defendants' assistance pursuing the strategy.

86.    Defendants agreed on the steps to be taken to accomplish that object.

87.    Defendants committed unlawful acts, including without limitation fraudulently inducing Plaintiffs to enter into the scope of work, knowingly or recklessly causing Plaintiffs to make material misstatements in filing tax returns, and knowingly or recklessly preparing tax returns that included material misstatements. Defendants' statements were incorrect and made without reasonable care.

88.    As a proximate result of Defendants' conspiracy, Plaintiffs paid $12 million in fees under the Engagement Letter for services that had no value, incurred costs related to correcting the misstatements Defendants caused Plaintiffs to make on state and federal tax returns, and exposed Plaintiffs to penalties and interest in connection with filing the flawed tax returns.

## SEVENTH CLAIM FOR RELIEF
### Declaratory Judgment – Against All Defendants

89.     Plaintiffs incorporate by reference paragraphs 1–47 of this Complaint as if fully set forth herein.

90.     A definite and actual controversy exists between Plaintiffs and Defendants regarding whether the Strategy or the methodology used to valuate the Contributed IP are confidential and constitute trade secrets.

91.     The Strategy and the methodology used to valuate the Contributed IP are both related to the tax basis for the Contributed IP. The tax basis of an asset must be disclosed to the IRS to support tax reporting positions with respect to an asset, and therefore cannot be confidential or a trade secret. Moreover, the Engagement Letter contemplated and required the disclosure of the Strategy and methodology used to valuate the Contributed IP to explain and validate the tax reporting positions Plaintiffs took in reliance on the Strategy.

92.     Plaintiffs are therefore entitled to a declaration under 28 U.S.C. § 2201(a) that the Strategy and the methodology used to valuate the Contributed IP are not confidential and are not trade secrets.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests the following relief:

A.  Judgment in Plaintiffs' favor and against Defendants;

B.  A declaration that the Strategy and the methodology used to valuate the Contributed IP are not confidential and are not trade secrets;

C.  An award of damages in an amount to be proven at trial;

D.  Attorneys' fees and costs to the extent permitted under law or equity;

E.  Prejudgment and post-judgment interest to the fullest extent permitted by law; and

F.  Any further relief this Court deems just and proper.

**PLAINTIFFS DEMAND A JURY ON ALL CLAIMS SO TRIABLE**

DATED: February 5, 2025.

*/s Douglas B. Tuminello*

Douglas B. Tumminello
Kenneth F. Rossman, IV
Joseph Hykan
WOMBLE BOND DICKINSON (US) LLP
1601 19th Street, Suite 1000
Denver, CO 80202
Phone: 303-623-9000
Fax: 303-623-9222
Email:  Doug.Tumminello@wbd-us.com
        Ken.Rossman@wbd-us.com
        Joe.Hykan@wbd-us.com

*Attorneys for Plaintiffs*

17